1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DAVID VAN SLYKE, FRANKLIN CHAN
and THOMAS E. BROWNING, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

   v.

CAPITAL ONE BANK, CAPITAL ONE
FINANCIAL CORPORATION, and
DOES 1–100, inclusive,

        Defendants.

_____/

No. C 07-00671 WHA

**ORDER GRANTING MOTIONS
FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In this putative class action concerning defendants' credit-card practices, defendants move for summary judgment on plaintiffs' deceit claims and claims under California's unfair competition law. Defendants have shown that there are no triable issues of fact remaining on plaintiffs' deceit claims. Likewise, defendants have shown that there are no triable issues of fact left in plaintiffs' unfair competition law claims. In their oppositions, plaintiffs also introduce a host of new theories on both the deceit claims and unfair competition claims. As these theories were not pleaded in the complaint or disclosed during written discovery, they will not be addressed here. They will instead be addressed in plaintiffs' pending motion for leave to file a third amended complaint. Accordingly, defendants' motion for summary judgment on plaintiffs' deceit claim is **GRANTED**. Defendants' motion for summary judgment on plaintiffs'

**United States District Court**
For the Northern District of California

1   unfair competition claim is **GRANTED**.  Plaintiffs' motion for class certification will be

2   addressed at the same time as plaintiffs' motion to file a third amended complaint.

3                                                **STATEMENT**

4        Plaintiffs David Van Slyke, Myrna Bragado, Robert Hart, and Susana Garcia were all

5   holders of defendant Capital One Bank's credit cards.  Defendant Capital One Financial is

6   Capital One Bank's parent company.  Capital One Bank is a Virginia-chartered bank with its

7   principal place of business in McLean, Virginia.  Capital One Financial is a Delaware

8   corporation also with its principal place of business in McLean, Virginia.

9        Plaintiff Bragado is a resident of San Jose, California.  She opened credit-card accounts

10  with defendants on October 18, 1997, October 17, 2003, November 3, 2003, and June 15, 2005

11  (Doome Decl. ¶ 9).  The credit limits of these accounts at opening were $5,000, $300, $500, and

12  $2000 respectively (*id*. at ¶ 12).  Bragado also had three more accounts opened in the names of

13  sole proprietorships for which she was financially responsible.  Those accounts were opened in

14  August 2002, November 2003, and August 2005, with opening credit limits of $1,700, $2,000,

15  and $300 respectively (Mottek Opp. Decl. Exh. H).

16       Plaintiff Hart resides in Gardena, Calfornia.  He opened credit-card accounts with

17  defendants on June 12, 2002, October 9, 2003, and November 4, 2004 (Doome Decl. ¶ 15).  The

18  credit limits of these accounts upon opening were $500, $3,000, and $500 respectively (*id*. at

19  ¶ 19).

20       Plaintiff Garcia is a resident of Woodland, California.  She opened three Capital One

21  credit-card accounts on June 13, 2002, July 28, 2003, and January 3, 2004 (*id*. at ¶ 22).  The

22  credit limits on those accounts were $325, $3,103, and $2,000 (*id*. at ¶ 25).

23       Plaintiff Van Slyke is a resident of Ohio.  He opened credit-card accounts with

24  defendants on May 22, 2002, September 4, 2002, December 27, 2002, and August 8, 2003 (*id*.

25  at ¶ 28).

26       The details of plaintiffs' allegations have been recounted more fully in numerous prior

27  orders.  In brief, plaintiffs complain about defendants' practices in issuing credit cards to the

28  sub-prime market.  They argue that part of defendants' business model is to issue several

credit-card accounts with low credit limits to subprime customers. When the cardholder defaults on *one* card, defendants charge fees on *all* cards, or so plaintiffs have alleged. At the hearing on these motions, defendants denied that this was their practice. Additionally, the minimum payments expressly listed on cardholders' statements are allegedly insufficient to keep the account out of default, a fact not disclosed on the statements. If a cardholder incurs a late or overlimit fee on his or her account, the minimum payment amount for that month allegedly does not include the fee. If the cardholder only pays the minimum payment, then the account is still in default, leading to more fees, or so it is alleged.

*          *          *

This action was originally filed on February 1, 2007. It asserted claims for (1) violations of the Truth in Lending Act; (2) violations of California's Consumer Legal Remedies Act; (3) violations of California's Unfair Competition Law, Business & Professions Code § 17200; and (4) deceit and omission of material facts. On April 9, 2007, defendants filed motions to transfer venue and to dismiss under Rule 12(b)(6). An order dated June 7, 2007, denied the motion to transfer. The motion to dismiss was granted as to the CLRA claim; the remainder of the motion was denied.

Plaintiffs filed their first amended complaint on June 27, 2007, omitting the CLRA claim. Thereafter defendants filed a motion to file a motion for reconsideration regarding certain issues raised by their motion to dismiss. An order thereon struck plaintiffs' allegations regarding Capital One's state of mind from plaintiffs' deceit claim, because Capital One's intention that its cardholders default on their accounts was not a fact that could be misrepresented or omitted. The remainder of the motion was denied.

On July 3, 2007, plaintiffs filed their second amended complaint to conform to the prior order. That complaint also added plaintiffs Bragado, Garcia, and Hart. Defendants filed a motion to dismiss plaintiffs' TILA claim on July 12, 2007. At the same time, they moved for summary judgment on all of plaintiff Browning's claims and all claims against Capital One Financial. The motion for summary judgment on Browning's claims was granted because his claims were barred by a prior settlement. The motion for summary judgment as to Capital One

3

United States District Court

For the Northern District of California

1   Financial was granted as to the TILA claim but denied as to all other claims.  The motion to

2   dismiss was granted but plaintiffs were permitted to file a motion for leave to file an amended

3   complaint.  Franklin Chan voluntarily dismissed his claims.  Because of the enormous number

4   of contentious discovery disputes, discovery was referred to Magistrate Judge Elizabeth

5   Laporte.  After a round of briefing, plaintiffs' motion for leave to file an amended complaint

6   was denied on September 28, 2007, because plaintiffs' proposed amendments did not state a

7   claim under TILA.

8        The three extant motions were filed on September 27, 2007.  Defendants filed two

9   voluminous motions for summary judgment — one directed at plaintiffs' deceit claims and the

10  other directed at plaintiffs' unfair-competition claims.  At the same time, plaintiffs filed a

11  motion to certify a class.  Plaintiffs also filed a motion for leave to file a third amended

12  complaint on October 5, 2007.  Plaintiffs' motion to shorten time to hear that motion at the

13  same time as these motions was denied.  The hearing on that motion is set for November 15,

14  2007.  Discovery closes on January 11, 2008, and trial is set for May 19, 2008.

**ANALYSIS**

16       As stated above, defendants have filed two motions for summary judgment on plaintiffs'

17  two remaining claims.  The deceit claim will be addressed first, followed by the unfair

18  competition claims.  Since plaintiffs have filed a motion for leave to file a third amended

19  complaint, plaintiffs' motion to certify a class will be addressed later along with that motion.

20       Summary judgment should be granted where the pleadings, discovery, and affidavits

21  show "that there is no genuine issue as to any material fact and that the moving party is entitled

22  to judgment as a matter of law."  FRCP 56(c).  The moving party has the initial burden of

23  production to demonstrate the absence of any genuine issue of material fact.  *Playboy*

24  *Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1023–24 (9th Cir. 2004).

25  Once the moving party has met its initial burden, the nonmoving party must "designate specific

26  facts showing there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24

27  (1986).  "If the moving party shows the absence of a genuine issue of material fact, the

28  non-moving party must go beyond the pleadings and 'set forth specific facts' that show a

4

1    genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (citation

2    omitted).

3        **1.    DECEIT CLAIMS.**

4        Plaintiffs' first claim alleges that defendants' practices were deceptive.  Defendants

5    contend that plaintiffs' minimum-payment theory is the only theory that is currently viable on

6    plaintiffs' deceit claims.  Any other theories plaintiffs attempt to bring forward either have not

7    been pleaded or were not disclosed in interrogatory answers.  After settling choice-of-law

8    questions, this section addresses plaintiffs' minimum-payment theory, then turns to plaintiffs'

9    other theories.

10        **A.    Choice of Law.**

11        As an initial matter, plaintiffs were less than forthcoming regarding which state's law

12    should apply to their deceit claims.  When asked in an interrogatory, they replied "state

13    common law" without designating a specific state (McGuire Decl. Exh. A, Resp. 6).

14    Defendants point out that there are a number of states' laws that could apply here — including

15    California, Ohio, and Virginia.

16        Federal courts exercising supplemental jurisdiction over state claims apply the choice of

17    law rules of the forum state.  *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164

18    (9th Cir. 1996).  California uses the governmental-interests test.  *First*, the Court must examine

19    the substantive law of the jurisdictions in question to see if they differ.  If there are no

20    differences, there are no conflicts.  *Second*, if there are differences, the Court must determine

21    whether each jurisdiction has an interest in having its law applied.  *Finally*, the Court must

22    consider which jurisdiction's interest would be more impaired if the other state's law were

23    applied.  *Washington Mutual Bank, F.A. v. Superior Court*, 24 Cal. 4th 906, 919–20 (2001).

24        Under California law, the elements for a deceit claim are:  (1) a misrepresentation;

25    (2) with knowledge of falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting

26    damage.  *Engalla v. Permanente Med. Group, Inc.*, 15 Cal. 4th 952, 974 (1997).  Under Ohio

27    law, the elements are:  (1) a representation; (2) material to the transaction at hand; (3) falsely

28    made; (4) with intent to mislead another into relying on it; (5) justifiable reliance; and (6) injury

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  proximately caused by reliance. *Burr v. Bd. of County Comm'rs of Stark Co.*, 491 N.E. 2d

2  1101, 1105 (1986). In Virginia, the elements are: (1) a false representation; (2) of a material

3  fact; (3) made intentionally and knowingly; (4) with intent to mislead; (5) reliance by the party

4  misled; and (6) resulting damage to the party misled. *Winn v. Aleda Constr. Co., Inc.*, 315

5  S.E.2d 193, 195 (1984). Among these three states, there appears to be little difference in each

6  state's law. Each of them requires a false, material statement, on which the plaintiff justifiably

7  relied, with actual injury caused by the plaintiff's reliance. Accordingly, there is no conflict in

8  applying California law to plaintiffs' deceit claims, at least for purposes of this motion.

9  **B.      Inadequate Minimum Payments.**

10          Plaintiffs allege that defendants' calculation of the minimum payment on cardholders'

11  credit-card statements is deceptive. The minimum payment listed on the statement is allegedly

12  too low to keep cardholders out of default because it does not include late fees and overlimit

13  fees. Up to this point in the litigation, the Court believed plaintiffs' theory was that defendants

14  did not add fees incurred in the prior cycle to the minimum payment for the statement that

15  showed the charges incurred in that cycle. For instance, as the Court understood the claim, a

16  cardholder exceeds her credit limit on April 20, incurring a fee of $39. Her statement cycle runs

17  from the first of the month to the end of the month, and her statements issue at the beginning of

18  the next month. The statement reaches her by mail several days later. The overlimit charge of

19  $39 shows up on her statement issued at the beginning of May, along with all of her other

20  purchases. The minimum payment indicated by Capital One on the statement, however, would

21  not be large enough (allegedly) to prevent her from incurring more fees, *even if she had no*

22  *more activity on her account*. If she paid only the minimum payment, her account would still

23  be in default (over the limit), she would incur more charges, and she would go further into

24  debt.[1] Several orders in this action laid out the Court's understanding on this theory. Before the

26          [1] Plaintiffs' alleged this theory as follows (Compl. ¶ 22):

27          As to "minimum" monthly payments, the "disclosures" in the Capital One Customer
            Agreement note that "APR [(Annual Percantage Rate)] increases and fees, including late,

28          overlimit and returned payment fees, may increase your minimum payment." *Id*. Capital One
            represents that paying the "minimum payment amount" will keep the account in good

hearing on this motion, the Court requested excerpts of transcripts of counsel's characterization of the claim. None were submitted by plaintiffs. In numerous pages of briefing, plaintiffs' never took the opportunity to rectify the Court's claimed misapprehension of this theory.

At the hearing on these motions, plaintiffs, however, announced that this is no longer their theory. They now argue that even if the minimum payment was low enough to get the account out of default, not including fees in the minimum payment is deceptive. Revising the above example to reflect the new theory, the cardholder incurs the same overlimit charge of $39 on April 20 for exceeding her credit limit by $10. The charge shows up on her statement for the cycle that closed on April 30, which she receives in the mail, say May 5. The minimum payment includes any amount by which she exceeded her credit limit. Plaintiffs now seem to argue that *this* alleged practice is deceptive because defendants do not alert the cardholder that if she goes over her limit again in the May cycle, she will incur more fees. As shown below, defendants are now entitled to summary judgment on this claim.

### *(1)    Defendants' Method of Calculating Minimum Payments.*

To remove any doubt that they do not practice plaintiffs' original theory, defendants present evidence of their methods for calculating minimum payments. In the relevant class period, defendants calculated minimum payments as the greatest of (Lee Decl. ¶ 3):

> (1) a percentage of the statement ending balance, rounded up to the nearest dollar, or a fixed dollar amount whichever was greater, but no more than the outstanding balance;

> (2) the sum of (a) minimum requested payments as yet unpaid from prior statement cycles and (b) the percentage/fixed dollar amount for the current statement cycle; and

---

standing. However, Capital One does not disclose that the "minimum payment" amount set forth on the customer's monthly billing statement does *not* include amounts allegedly due for late, over-the-limit, returned payment fees or other fees incurred in that month, notwithstanding that Capital One charges interest on the fees. Most customers in the sub-prime market targeted by Capital One make the "minimum payment" reflected on their bills. But where penalty fees have been assessed for a given month, customers who pay only the minimum payment amount represented as the customers' "minimum payment amount" did not include amounts incurred that month for penalty fees, including late, over-the-limit and returned payment fees. As a result, customers find themselves continually in "default" and cannot "catch up" because the monthly statements fail to include these fees as part of the "minimum payment" for that particular month.

7

(3) the amount by which the statement ending balance exceeds the
account's credit limit.

James Lee, managing vice president of business analysis for Capital One Bank, declared that
during the relevant times, the percentage and fixed amounts in the first part of the rule were 3%
and $15 for all accounts at issue here (*id*. at ¶ 4). Additionally, when determining whether a
cardholder has exceeded their credit limit, Capital One has subtracted certain charges from the
account balance, including past due fees, cash advance fees, finance charges and membership
fees (*id*. at ¶ 6). Using this method, if a cardholder was near to exceeding his credit limit and
incurred a late fee, the late fee would not make the account exceed the limit.

Defendants contend that the "greatest of" logic of this rule ensures that the requested
minimum payment is always sufficient to cure any default, provided, however, that the
cardholder does not incur any more fees in the *next* period. Since late, overlimit, and
membership fees get added to the balance of the account, the third option in defendants'
calculations ensures that a cardholder paying the minimum payment will always be under the
limit because he or she will always pay at least the amount by which the account exceeds the
limit. For example, under defendants' system, a cardholder has a credit limit of $500. He
initiates a transaction that takes his account over the limit by $100, and incurs a $39 fee. His
minimum payment will be at least $139, which will be sufficient to get his account under his
credit limit. If he initiates more transactions in the next statement period, then his account may
again go over the limit. In that event, however, the additional fees are not caused by any
reliance on the minimum payment. This is because the customer presumably knows his credit
limit and knows his balance. No one forces him to use the card before he is able to pay down
the balance and free up some of the credit line. If he does it anyway, that is his choice.

Plaintiffs argued at the hearing that this is precisely the problem. Cardholders pay the
minimum payment after exceeding their credit limits, and plaintiffs conceded that they would be
below the limit and would not incur more fees. Cardholders would still be lulled into some
"false sense of security" by paying the minimum payment. According to plaintiffs, cardholders
would think that they would be "safe" to use their accounts again when they would just incur
more fees if they made a single purchase. This is insulting to the cardholders' intelligence. If

United States District Court

For the Northern District of California

1   the account was overlimit by $99, and the cardholder pays $100, he or she must surely be aware

2   of his or her own balance and credit limit.  These two facts are not concealed.  Plaintiffs do not

3   argue otherwise.

4                    *(2)*      ***The Specific Accounts of Named Plaintiffs.***

5          Apart from their policies, the motion demonstrates that on named plaintiffs' actual facts,

6   the alleged original scenario never happened.  The crux of defendants' fact analysis is that

7   plaintiffs were never damaged by relying on the minimum-payment amount.  To show

8   otherwise, plaintiffs would have to show the following things.  To illustrate, a cardholder gets

9   monthly statements in the first cycle which runs through the month of May.  The cardholder

10  gets a statement listing all charges for the April cycle a few days into May.  *First*, a plaintiff

11  would have had to have made a payment in the May cycle that was at least as much as the

12  minimum payment stated for the April cycle, but less than the minimum payment plus any fees

13  incurred in the second cycle.  Defendants refer to these as "intermediate payments."  *Next*, a

14  plaintiff would have had to have incurred a late or overlimit fee in the May cycle.  If not, there

15  would be no resulting damage.  *Finally*, the fee in the May cycle could not have been incurred

16  because of other account activity.  This means that the intermediate payment for the April cycle

17  charges must have been timely, and that the cardholder did not exceed the credit limit again in

18  the May cycle.  If so, the fee assessed in the May cycle would have resulted from more account

19  activity, not from making an intermediate payment.

20         In practice, for this scenario to have happened, say that the cardholder went over the

21  credit limit by $100 in the April cycle and was assessed a $39 fee.  The cardholder gets a

22  statement early in May that shows $139 as the minimum payment.  The cardholder timely pays

23  $140.  Without any other activity on his account, the cardholder is assessed an additional fee

24  because he only made an intermediate payment.

25         Defendants analyzed each named plaintiffs' accounts to determine whether this ever

26  occurred.  Defendants declared that they pulled together all of plaintiffs' credit-card statements

27  within the statute of limitations.  They found 198 instances where any kind of fees were

28  assessed (McCabe Decl. Exh. 1).  Of those, defendants found only 36 instances where a named

1  plaintiff made an intermediate payment, an amount at or above the minimum, but less than the

2  minimum payment plus any other fees assessed in the second cycle (*id*. at Exh. 2).

3          Looking at those 36 instances, defendants point out that in 27 of them, plaintiff was not

4  assessed a fee in the second cycle.  There was no damage from relying on the minimum

5  payment because there was no resulting fee in the second cycle.  Turning to the other nine,

6  defendants show that one of them, for Van Slyke, was because he failed to make any payments

7  at all two months in a row which, according to his credit agreement, resulted in the account's

8  being moved to a higher default interest rate (Doome Decl. Exh. RR).  It was not due to his

9  paying the minimum payment.

10         Defendants present evidence that the other eight instances of second-cycle fees were

11  triggered by something other than making an intermediate payment.  For example, Garcia

12  incurred an additional fee because she exceeded her credit limit in the second cycle (McCabe

13  Decl. Exh. 3).  Her first cycle ended on December 22, 2004.  She initiated a transaction that

14  took her account balance over her credit limit on December 8, 2004, and she was assessed a fee

15  of $29.  She made a timely payment on the December statement of $100, and the requested

16  payment was $93.  This took her account below her account credit limit.  On January 4, 2005,

17  Garcia initiated a transaction that took her over her credit limit again, so she was charged an

18  additional overlimit fee in the second cycle (Doome Decl. Exh. II, CO 0006-10002692–2694).

19  Similarly, Garcia incurred an overlimit fee on July 24, 2006, made an intermediate payment,

20  and initiated subsequent transactions that put her over the limit again in the second cycle (*id*. at

21  CO 0006-10002736–2738).

22         In another incident, Garcia was assessed an annual membership fee of $59 in the first

23  cycle.  Her account technically exceeded her limit, but she was not charged an overlimit fee.

24  She then initiated two transactions in the next cycle that did put her over the limit and was

25  assessed an overlimit fee in the second cycle (*id*. at CO 0006-10002882–2885).  In March 2004,

26  Garcia again went over her limit, paid an intermediate payment that brought her balance down

27  below the limit, then initiated another transaction in the second cycle that took her over the limit

28  again.  She was assessed another fee in the second cycle (*id*. at CO 0006-10002667–2952).

United States District Court

For the Northern District of California

10

**United States District Court**
For the Northern District of California

1   Another incident on Garcia's accounts played out slightly differently.  In the cycle

2   ending May 6, 2005, she exceeded her credit limit on April 10 and was assessed a $29 fee.  She

3   made no payment on her balance in that cycle, so a late fee of $35 was assessed on May 6.  At

4   the beginning of the second cycle, she was assessed an additional overlimit fee on May 7 for

5   failing to take her account below the limit in the first cycle.  This fee was based on her failing to

6   make a payment in the first cycle, not on paying an intermediate payment (*id*. at CO

7   0006-10002982–2985).  Garcia found herself in a similar situation in July 2005.  She exceeded

8   her credit limit in June, was assessed a fee, and made no payment in that cycle, which ended on

9   July 6.  On July 7, she made a payment that was less than the requested payment and was

10  insufficient to get her account below her credit limit.  Garcia was assessed a fee because she

11  was still over her limit despite the payment that had posted to her account.  She made an

12  additional payment of $100 on July 15.  The fee assessed into the second cycle was because she

13  did not pay the minimum requested payment in the first cycle (*id*. Exh. O at CO 0006-

14  10002986–2989).

15  Plaintiff Bragado's account showed similar activity.  She initiated a transaction on

16  August 11, 2005, that brought her account balance over her credit limit for the cycle ending

17  August 16.  She was assessed a fee.  Bragado failed to make her minimum payment on the

18  charges in the first cycle, so she was assessed late and overlimit fees on August 17 at the

19  beginning of the next cycle.  She made an intermediate payment later in the second cycle, but

20  the fees assessed on August 17 resulted from her failure to make a payment in the first cycle (*id*.

21  at CO 0006-10001793–1798).

22  The final identified incident involves plaintiff Van Slyke.  He initiated a transaction on

23  December 21, 2004, which took his account over his credit limit for the period ending

24  January 13, 2005.  Van Slyke failed to make a payment in that cycle, so he was assessed late

25  and overlimit fees on January 14, 2005.  He made an intermediate payment in the next cycle,

26  ending February 13, 2005, but the earlier fees were assessed because he failed to make a

27  payment in the first cycle (*id*. at Exh. SS CO 0006-10003289–2192).  In sum, the second-cycle

28  fees in each of these examples were incurred *not* because named plaintiffs paid only the

11

United States District Court

For the Northern District of California

requested minimum payment. The second-cycle fees occurred either because plaintiffs failed to make a payment in the first cycle, or took their accounts over their credit limits again in the second cycle. This confirms that under defendants' actual policies, the minimum-payment amount has been sufficient to keep the account out of default *provided the cardholder does not incur any additional fees in the next period*, as illustrated in the real-world examples of our four named plaintiffs.[2]

*             *             *

Plaintiffs do not present any evidence of their own to refute defendants' proffer. They appeared to switch theories in their opposition. They objected to defendants billing overlimit and late fees in the cycle *after* the cycle in which they were incurred, *i.e.*, the fees incurred showed up together with the purchases made in the same cycle. They now appear to argue that the fact that the minimum payment for the *first* cycle does not include all fees incurred in the *second* cycle is deceptive. The problem with this theory is that it requires a crystal ball.

Defendants have no way of gazing into a crystal ball to know when a cardholder might exceed his or her credit limit in the future. If a statement in the first cycle has already issued, defendants have no practical way of anticipating the additional fee, if it occurs at all, until the next statement where the fee will show up along with the purchases made in that cycle.

At the hearing, plaintiffs presented a "false sense of security" argument. That is, paying the minimum payment somehow lulls cardholders into believing that they can go out and use their cards again, when all it has done is prevented them from incurring more fees. Cardholders, however, presumably know their credit limit and know their balances. They surely know when they are on the brink of going over the limit. Accordingly, defendants have

---

[2] Defendants also present evidence that each plaintiff testified in his or her deposition that they did not rely on the stated minimum payment in deciding the amount they would pay each month. Myrna Bragado testified that she paid more than the minimum stated payment when she had sufficient funds (McGuire Decl. Exh. B, 119:18–120:2). The testimony of the other plaintiffs concurred; they paid as much as they could afford regardless of the amount stated on the minimum payment (*id*. at Exh. C, 182:25–183:15; Exh. D, 177:2–11; Exh. E, 177:2–11). This testimony does not go quite so far as defendants contend. Plaintiffs may have made an extra effort to pay at least the minimum payment, so it is still possible that they could have relied on that amount in some fashion. As defendants have shown above, however, defendants have eliminated triable issues of fact as to whether that reliance by itself *caused* plaintiffs to incur more fees.

1  shown that there are no triable issues of fact as to the minimum-payment theory.  Defendants'

2  motion for summary judgment on the deceit claims is **GRANTED**.

3              **C.      Plaintiffs' Other Theories.**

4        Plaintiffs present a litany of other theories, some old and some new, of how defendants

5  have engaged in deception.  Those new theories are seemingly the reason that plaintiffs have

6  filed a motion for leave to file a third amended complaint.  The parties disagree over the

7  meaning of the Court's order dated September 28, 2007, denying plaintiffs' motion for leave to

8  file a third amended complaint.  Defendants argued that plaintiffs improperly added new

9  allegations to the proposed pleading that was the subject of that motion.  This was so.  The

10 order did not address those allegations because plaintiffs were explicitly told that they could

11 only amend their complaint to add their "fees on fees" theory to their TILA claim.  Plaintiffs

12 ignored the order, so any other new allegations were not considered.  Some of the theories

13 plaintiffs present are old, and some are entirely new.  At any event, it is inappropriate to

14 introduce a bevy of new theories in an opposition to a motion for summary judgment.  These

15 new theories will be addressed in plaintiffs' pending motion to file an amended complaint.

16             **2.      UNFAIR COMPETITION LAW CLAIMS.**

17        Under Section 17200, the plaintiff must assert an "unlawful, unfair or fraudulent

18 business act or practice."  Thus, Section 17200 establishes three alternative theories for finding

19 illegal conduct:  (1) unlawful, (2) unfair and deceptive, or (3) fraudulent.  *Cel-Tech*

20 *Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  Since

21 Section 17200 is written in the disjunctive, the plaintiff need allege only one of the three

22 theories to properly plead a claim.  For example, the plaintiff may allege unlawful business

23 practices without alleging unfair or fraudulent business practices.  Here, plaintiffs argue that

24 Capital One's practices violated all three prongs of the statute.

25             **A.      Fraudulent.**

26        Section 17200 claims that are grounded in fraud must satisfy the particularity

27 requirements of Rule 9(b).  *Vess*, 317 F.3d at 1103 (applying Rule 9(b)'s pleading requirements

28

**United States District Court**
For the Northern District of California

13

1    for claims based in fraud to a Section 17200 claim).  Accordingly, plaintiffs must identify with

2    particularity the statements or omissions that were made.

3          Defendants argue that the only practices plaintiffs have identified as fraudulent were:

4    (1) that the minimum payment amount on credit card statements was too low, which caused

5    plaintiffs to pay overlimit or late fees in the next cycle, as set forth above, and (2) that

6    cardholders were issued multiple credit cards in hopes that cardholders would default.  In their

7    opposition, plaintiffs recite a litany of new ways which they claim to have just discovered that

8    defendants' practices were fraudulent.  Defendants only present arguments as to the

9    above-stated two theories.

10                    *(1)      Minimum Payments.*

11          Plaintiffs' minimum-payments argument on its UCL claim is much the same as its

12    argument on its deceit claim.  Defendants failed to include fees in the stated minimum payment

13    amount, so when a cardholder only paid the minimum payment, his or her account would still

14    be in default.  As described above, defendants have shown that this is simply not their practice.

15    Any additional fees came from new and later conduct — by making late (or no) payments for

16    the first cycle or exceeding their credit limits in the second cycle.  Thus, plaintiffs did not (and

17    could not) suffer injuries as a result of this policy.

18          Plaintiffs argue that this claim should survive because the fraudulent prong of

19    Section 17200 does not require reliance or actual deception.  "A violation [of Section 17200]

20    can be shown even if no one was actually deceived, relied upon the fraudulent practice, or

21    sustained any damage.  Instead, it is only necessary to show that members of the public are

22    likely to be deceived." *Podolsky v. First Healthcare Corp.*, 50 Cal. App. 4th 632, 647–48

23    (1996).  That decision, cited by plaintiffs, predated amendments to the unfair competition law in

24    2004.  Now, to have standing to bring a Section 17200 claim as a consumer, plaintiffs must

25    show that they lost money or property as a result of defendants' fraudulent practices.  Cal. Bus.

26    & Prof. Code § 17204.  As with the deceit claim, plaintiffs have failed to do precisely that.

27    They have presented no evidence that they were harmed by paying an intermediate payment.

28

United States District Court

For the Northern District of California

14

United States District Court

For the Northern District of California

1   Again, plaintiffs repeat their "false sense of security argument" — plaintiffs allegedly

2   thought that by paying their minimum payment, they had smooth sailing to use their cards

3   again.  And again, this Hail Mary pass by plaintiffs gets them no further.  It is not a false

4   statement, and plaintiffs fail to show how it could be deceptive for the reasons stated above.

5   Accordingly, this minimum-payment theory fails.

6                    *(2)      Multiple Low-Limit Cards.*

7   Plaintiffs also argue that defendants' practice of granting cardholders several credit card

8   accounts with low limits is deceptive.  According to plaintiffs, defendants' intention is that

9   cardholders will default on one account so defendants can charge fees on all accounts.  At the

10  hearing, defendants denied that this was ever their practice.  In their briefing, however, they did

11  not present evidence to that effect.  Instead they argued that plaintiffs did not open multiple

12  low-limit accounts during the statute of limitations and that these claims were preempted by

13  federal banking laws governing the amounts of fees.

14  The credit card agreements state that Capital One reserves the right to impose "cross-

15  default" fees (Doome Decl. Dkt. 24 Exh. A–C):

16          To the extent permitted by law, you may also be in default under
            this Agreement if: (1) you violate any of the other terms of this
17          Agreement, or any of the terms of any other agreement with us or
            any of our affiliates . . . .
18

19  In other words, to take one example, if a customer has two cards and pays late on only one card,

20  the customer may be deemed in default on both cards.  This order is unwilling to bless any and

21  all cross-default scenarios, at least without a full exposition of all scenarios in which a

22  cross-default could be imposed.  Although the language quoted above seems like a "disclosure,"

23  it could lead to draconian scenarios if taken to its full logical limit, which would raise the

24  question whether fair disclosure had really been given by the general language quoted above.

25  This order does not condemn the provision.  It only declines to resolve the issue based on the

26  defense that it was "disclosed."

27  There is a more straightforward answer.  The record shows that *no* named plaintiff has

28  ever been subjected to any cross-default.  Therefore, summary judgment on that narrower

    ground as to the immediate named plaintiffs is **GRANTED**.

**B.     Unfair.**

As to the "unfair" prong, California's test for what constitutes an unfair practice in actions brought by consumers is currently "in flux."  In *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 185–86 (1999), the California Supreme Court rejected the so-called "balancing test" for determining whether a practice could be unfair under Section 17200.  This arose in the context of a suit between competitors.  The earlier balancing test involved balancing the harms to the consumer against the utility of the defendant's practice to determine whether the practice was unfair.  *South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 815 (1999).  The *Cel-Tech* decision required that an "unfair" policy within the meaning of Section 17200 must be tethered to a legislatively declared policy or a showing of an actual or threatened impact on competition.  20 Cal. 4th at 186. In *Cel-Tech*, the California Supreme Court stated the following:

> [T]o guide courts and the business community adequately and to promote consumer protection, we must require that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition.  We thus adopt the following test:  When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

*Id.* at 186–87.  It did not, at least in explicit terms, decide the test for consumer suits.

Reading *Cel-Tech* literally, some California courts have found *Cel-Tech* applicable only to cases involving competitors, and not to consumer actions, and have continued to use the balancing test for unfairness from *South Bay Chevrolet*.  *See McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457 (2006) ("The test of whether a business practice is unfair involves an examination of that practice's impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer.").  Other courts have created or adopted their own tests.

Recently, the Ninth Circuit has acknowledged this division and held that a district court did not err by using the balancing test set out in *South Bay Chevrolet*.  *Lozano v. AT&T*

United States District Court
For the Northern District of California

1     *Wireless Servs., Inc.*, ___ F.3d ____, 2007 WL 2728758, *15–*16 (9th Cir. Sept. 20, 2007).

2     According to the Ninth Circuit, "the remaining options are to apply *Cel-Tech* directly . . . and

3     require that the unfairness be tied to a 'legislatively declared' policy or to adhere to the former

4     balancing test under *South Bay*." *Id*. at *15 (internal citations omitted).  The Ninth Circuit in

5     *Lozano* stated that adopting either the *Cel-Tech* or *South Bay* standard "does not necessitate

6     rejection of the other," and upheld a district court's decision to use the old balancing test from

7     *South Bay Cheverolet* "in the absence of further clarification from the California Supreme

8     Court."  *Ibid*.  Significantly, it did not compel the acceptance of the balancing test and leaves

9     district courts some flexibility in applying Section 17200 at least until the California courts

10    settle on a firm rule for consumer cases.

11            Although the California Supreme Court did not reach the issue of consumer cases, the

12    rationale of *Cel-Tech* nonetheless compels the conclusion, at least in this Court's judgment, that

13    the unfairness prong must also be tethered to some legislative policy; otherwise the courts will

14    roam across the landscape of consumer transactions picking and choosing which they like and

15    which they dislike.  *Lozano* did not require using the balancing test, so using *Cel-Tech*'s

16    tethering standard is still appropriate and, indeed, necessary as this Court sees the development

17    of the state law under Section 17200.  This order now turns to the proper application of this test

18    to our record.

19                              *(1)      Unfair Policies.*

20            Defendants next argue that the multiple-card strategy could not be an unfair practice

21    under either the tethering standard in *Cel-Tech*.  *Significantly, in their lengthy discussion of this*

22    *claim in their opposition, plaintiffs did not identify any policy or spirit of the law that*

23    *defendants' practices violate.*  Moreover, when directly asked at the hearing whether there was

24    a legislative policy that underpinned this theory, plaintiffs' counsel declined to state one.

25    Instead, she discussed other theories not addressed by this order.  Also, as this order found

26    above, the record shows that cross-default never happened to any of the named plaintiffs.

27

28

                                            17

United States District Court

For the Northern District of California

1    Accordingly, under the test set out in *Cel-Tech*, plaintiffs have not identified a legislative

2    policy, thus they cannot maintain a claim under the unfair prong.[3]

3                    ***(2)      Fee Pile-On.***

4        Plaintiffs next claim that defendants' "fee pile-on" is an unfair practice under

5    Section 17200.  According to plaintiffs, defendants have practices of charging fees on multiple

6    cards, charging fees more than one time for the same activity, and "hiding the ball" on their

7    practices for calculating fees.  The practical effect is to put cardholders so far behind on their

8    payments that they cannot get out of debt.  Some cardholders end up owing amounts many

9    times in excess of anything they purchased using their cards.  Plaintiffs also argue that these

10   practices generate large amounts of revenue for defendants while essentially ripping off their

11   cardholders.  This practice would likely fare better under the balancing test, as this policy

12   appears to cause considerable harm to at least some consumers, while its only discernible

13   purpose is to generate fees.  As stated above, this order declines to use the balancing test.

14   Plaintiffs failed to identify a legislative policy to which this theory is tethered, so this claim fails

15   under *Cel-Tech*.  Accordingly, defendants' motion for summary judgment is **GRANTED** as to

16   this claim.

17                   ***(3)      Payment Protection Plans.***

18       Plaintiffs also allege that defendants did not make sufficient disclosures regarding their

19   payment protection plans sold in conjunction with their credit cards.  Specifically, Hart alleged

20   that he paid for a "credit protection plan" but did not receive any benefits.  Hart, however,

21   admitted at his deposition that he had no payment protection plan (McGuire Decl. Exh. B

22   50:13–24).  His card statements are in accord, and plaintiffs do not dispute these facts.

23   Plaintiffs were asked if they pleaded that any other named plaintiff had a payment-protection

24   plan.  Plaintiffs' counsel was unable to identify any such allegation in any complaint.  Since

25   Hart was the only named plaintiff who was alleged to have purchased a payment-protection

26   plan, at least in this iteration of the complaint, defendants' motion for summary judgment as to

27   this claim is **GRANTED**.

28

---

[3] It is worth adding that no claim is made that the practice is undisclosed.

**United States District Court**
For the Northern District of California

### (4)   *Minimum Payments.*

In yet another last-ditch effort to save this claim, at the hearing plaintiffs' counsel threw out an argument that defendants' policy of not including fees in the minimum payments was an unfair practice.  Plaintiffs' counsel made vague references to some letter or statements by the Office of the Comptroller of Currency that disapproved of this practice.  No such reference appears in over 100 pages of briefing and over two banker's boxes full of documents submitted on these motions.  Nor did plaintiffs' counsel enlighten the Court at the hearing as to where she found these statements.  It is not the Court's task "to scour the record in search of a genuine issue of triable fact."  *Keenan v. Allen*, 91 F.3d 1275, 1278 (9th Cir. 1996).  If plaintiffs wished to rely on these statements, they should have identified them long before the hearing.  Research reveals that the OCC has made some statements regarding the dangers of negative amortization on credit card accounts.  A statement from the OCC regarding credit account management stated as follows:

> Competitive pressures and a desire to preserve outstanding balances have led to a general easing of minimum payment requirements in recent years.  New formulas that have the effect of further delaying principal repayment are gaining popularity in the industry.  In many instances, the result has been liberal repayment programs that increase credit risk and mask portfolio quality.  These problems are exacerbated when minimum payments consistently fall short of covering all finance charges and fees assessed during the billing cycle and the outstanding balance continues to build ("negative amortization").  In these cases, the lender is recording uncollected income by capitalizing the unpaid finance charges and fees into the account balance owed by the customer.  The pitfalls of negative amortization are magnified when subprime accounts are involved, and even more so when the condition is prolonged by programmatic, recurring over-limit fees and other charges that are primarily intended to increase recorded income for the lender rather than enhance the borrowers' performance or their access to credit.

> The Agencies expect lenders to require minimum payments that will amortize the current balance over a reasonable period of time, consistent with the unsecured, consumer-oriented nature of the underlying debt and the borrower's documented creditworthiness.  Prolonged negative amortization, inappropriate fees, and other practices that inordinately compound or protract consumer debt and disguise portfolio performance and quality raise safety and soundness concerns and are subject to examiner criticism.

1   Office of the Comptroller of Currency, Board of Governors of the Federal Reserve System,

2   Federal Deposit Insurance Corporation, and Office of Thrift Supervision, *Credit Card Lending:*

3   *Account Management and Loss Allowance Guidance*, Jan. 8, 2003,

4   http://www.occ.treas.gov/ftp/bulletin/2003-1a.pdf.

5            These statements by the OCC disapprove of at least some practices in the credit card

6   industry that have the effect of keeping consumers in debt for extended periods of time.  Even if

7   this was the OCC statement that plaintiffs referenced at the hearing, this is not a legislatively

8   declared policy.  It reflects only the agencies' expectations of what lenders should do.  At best,

9   it is a bulletin or statement that is hortatory in nature.  Nothing in it *requires* that defendants

10  follow the policies it lays out, nor does the statement indicate that it is enforcing any regulation

11  or law.  This statement of disapproval is simply too advisory in nature to form the basis of a

12  legislatively declared policy.  So even if defendants' policies were akin to those discussed by

13  this OCC statement, plaintiffs still have not identified a legislatively declared policy to which

14  their theory is tethered.  Accordingly, defendants' motion for summary judgment on plaintiffs'

15  unfair competition claims is **GRANTED**.

16            **C.      Unlawful.**

17            Under California's Unfair Competition Law, an unlawful business practice is a practice

18  that violates any other law.  *Cel-Tech Commn's, Inc.*, 20 Cal. 4th at 180.  Section 17200

19  essentially allows a plaintiff to "borrow" other laws to form the basis of a violation under this

20  prong.  If a practice is expressly permitted by law, it cannot be an unlawful business practice.

21  *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 718 (2001).  Even if there is no

22  private right of action under the borrowed law, a violation of that law can be an unlawful

23  practice.  *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 561–62 (1998).

24                    *(1)      Other States' Unfair and Deceptive Practices Acts.*

25            Plaintiffs argue that the Unfair and Deceptive Practices Acts statutes of *other states* in

26  which members of the putative class reside can be borrowed as the basis of an unlawful practice

27  claim.  It is clear that other California consumer statutes can form the basis of violations under

28  the unlawful prong.  *See Podolsky v. First Healthcare Corp.*, 50 Cal. App. 4th 632, 648–49

(1996) (holding that a practice that violated California's Consumer Legal Remedies Act could be considered an unlawful practice under Section 17200).  Also clear is that uncodified state court precedent can suffice.  *See Bondanza v. Peninsula Hosp. & Med. Ctr.*, 23 Cal. 3d 260, 266–67 (1979) (using court decisions regarding liquidated damages provisions in contracts as an unlawful practice).

No decision, however, has been found that allows a plaintiff to import either statutes or precedent from *another state* as an unlawful business practice.  This order, moreover, notes that California courts have been highly critical of attempts to apply the unfair competition law outside California borders for transactions that do not affect California residents and did not take place within the state.  *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 714, 725 (1999) (noting that applying Section 17200 under such circumstances raised serious due-process problems under *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)).  Granted, this principle does not address the situation at hand, but it does evince wariness at using California's unfair competition law to avenge every shady business practice across the country.  Absent clearer directive from above, this order declines to borrow precedent or statutes from other states.

Plaintiffs cite to a commentator who noted that the decision should turn on California choice-of-law principles.  Plaintiffs also argues that the so-called UDAP statutes of certain other states are "highly similar to the fraudulent prong of the UCL" (UCL Opp. 14).  Even if this order were to adopt plaintiffs' logic, plaintiffs give little information regarding the actual substance of these laws of other states.  Moreover, if the laws of other states are so similar to the fraudulent prong of Section 17200, why turn to them in the first place?  At least in this action, the laws and precedent of other states will not form the basis of an unlawful business practice claim.

### *(2)    Federal Trade Commission Laws.*

Next, plaintiffs argue that defendants have violated Federal Trade Commission laws, specifically, FTC Trade Regulation Rule 16 C.F.R. 444.4(a).  This regulation, codified under the heading "Late Charges," provides:

> In connection with collecting a debt arising out of an extension of
> credit to a consumer . . . it is an unfair practice within the meaning
> of Section 5 of the FTC Act for a creditor, directly or indirectly,
> to levy or collect any delinquency charge on a payment, which
> payment is otherwise a full payment for the applicable period and
> is paid on its due date or within an applicable grace period, when
> the only delinquency is attributable to late fees or delinquency
> charges assessed on earlier installments.

16 C.F.R. 444.4(a). This regulation would apply if, for example, defendants assessed a late fee on a payment solely because it did not pay all fees that had since been incurred. Plaintiffs contend that defendants' practice of billing fees to the next cycle violates this regulation. This regulation, however, does not fit the record here. Plaintiffs argue that this regulation also makes defendants' so-called fee pile-on illegal, but this regulation only actually forbids imposing late charges when a payment is timely paid, other than the amount of the late fee. Accordingly, this cannot form the basis of plaintiffs' claim.

Next, plaintiffs points to regulations that they believe govern Capital One's sales of its payment protection plans. As shown above, there is no evidence that any named plaintiff ever purchased such a plan, so plaintiffs cannot argue that they have been injured by these practices.

Finally, plaintiffs argue that defendants' fee pile-on practices are illegal under *Bondanza v. Peninsula Hosp. & Med. Center*, 23 Cal. 3d 260, 266–68 (1979). That decision held that it was an unfair practice to charge penalty fees on uncollected debts where the amount of the fees bore no relationship to the costs of collection. In *Bondanza*, there was no prior agreement between the hospital and its patients on collection costs; the hospital merely charged a collection fee equal to one-third of the outstanding bill. *Id.* at 267. Here, plaintiffs' situation is not analogous. Capital One did charge fees. Plaintiffs allege, although they do not present evidence, that the fees sometimes far exceeded the balance on the account. Defendants presented evidence, which plaintiffs did not dispute, that unlike in *Bondanza*, the fee structure was disclosed to plaintiffs when they opened their credit accounts. As noted in other decisions, the unfair competition law is not an open license to review the fairness of contracts. *See Searle v. Windham Int'l, Inc.*, 102 Cal. App. 4th 1327, 1334–35 (2002). Accordingly, plaintiffs have not found a state law that they can borrow to form the basis of an unlawful business practice claim. Defendants' motion for summary judgment as to this claim is **GRANTED**.

**D.      Van Slyke and Other States' Unfair Competition Laws.**

Defendants argue that, as a matter of law, plaintiff Van Slyke cannot bring a claim under California's unfair competition law.  California's Section 17200 does not apply to "injuries suffered by non-California residents, caused by conduct occurring outside of California's borders, by defendants whose headquarters and principal places of operations are outside California." *Norwest Mortgage, Inc.*, 72 Cal. App. 4th at 725 (noting that applying Section 17200 under such circumstances raised serious due-process problems under *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)).

Plaintiffs do not dispute that Van Slyke is a resident of Ohio.  Nor do they dispute that Capital One Bank is a Virginia-chartered bank with its principal place of business in Virginia, and that Capital One Financial is a Delaware corporation also with its principal place of business in Virginia.  Indeed, plaintiffs concede that Section 17200 does not apply to Van Slyke's claims.  Instead, they argue that Van Slyke has alleged claims under Ohio's unfair and deceptive practices statute.  No such claim under Ohio law appears in the complaint. Plaintiffs also argue that there would be no conflict of laws in applying California law to Van Slyke's claims.  This assertion ignores due-process concerns that arise from applying California law outside of California.  Accordingly, Van Slyke cannot maintain a claim under California's unfair competition law.  Defendants' motion for summary judgment as to Van Slyke's Section 17200 claims is **GRANTED**.

**E.      Plaintiffs' New Allegations.**

This order notes also that plaintiffs have made new allegations of practices that violate Section 17200.  Plaintiffs' opposition to this motion repeats the same litany of allegedly unfair practices that plaintiffs listed in their opposition to defendants' motion on the deceit claims. Just like in the deceit claim, these new allegations do not appear in the operative complaint, nor were they disclosed in any of plaintiffs' responses to interrogatories.  Indeed, they appear to be the subject of plaintiffs' extant motion for leave to file a third amended complaint.  Because these allegations are not part of the complaint at this time, they will not be considered here.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

**CONCLUSION**

For all of the above-stated reasons, defendants' motion for summary judgment on plaintiffs' deceit claims is **GRANTED**.  Defendants' motion for summary judgment on plaintiffs' unfair competition claims is **GRANTED**.

**IT IS SO ORDERED.**

Dated:  November 7, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE